UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHARLOTTE E. POOLE**,                              Case No. 1:12 CV 2649

        Plaintiff,                              Magistrate Judge James R. Knepp II

   v.                              MEMORANDUM OPINION AND
                              ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Charlotte E. Poole seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On December 15, 2008, Plaintiff filed an application for SSI claiming she was disabled due to chronic obstructive pulmonary disease (COPD), chronic bronchitis, back and neck "disk problems", depression, knee pain, and carpal tunnel syndrome (CTS). (Tr. 135-37, 170, 211). She alleged a disability onset date of August 1, 2004. (Tr. 135). Her claim was denied initially (Tr. 81-83) and on reconsideration (Tr. 88-90). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 10). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 11, 32). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On October 23, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Vocational History and Daily Activities

Born June 12, 1963, Plaintiff was 47 years old at the ALJ hearing held March 17, 2011. (Tr. 32, 38). She attended high school until the eleventh grade and later obtained her GED. (Tr. 41). Plaintiff lived by herself in an apartment and cooked, cleaned, mopped, shopped for groceries, vacuumed, did dishes, watched television, and could read a book in a day's time. (Tr. 52-55). She also cared for two cats. (Tr. 55). Plaintiff was right-handed, got along well with authority figures, and could follow written and verbal instructions. (Tr. 39, 189).

At the time of the hearing, Plaintiff's driver's license was suspended for unpaid tickets. (Tr. 40). However, she participated in a community service program to resolve the unpaid tickets and lift the suspension. (Tr. 40, 42). Her community service included rolling silverware into napkins at a banquet hall for five hours a day over five days. (Tr. 42, 50). Plaintiff's past relevant work experience included positions as a property manager, housekeeper, janitor, machine operator, nurses' aide, telemarketer, and customer service representative. (Tr. 43, 158).

### *Physical Impairments*

### Neck and Back Treatment

Plaintiff sought treatment for neck and back pain at MetroHealth Medical Center (Metro) on numerous occasions in 2007 and 2008. (Tr. 236-347). In October 2007, a physical examination revealed normal range of motion in Plaintiff's spine, no tenderness, normal gait and reflexes, grossly intact sensation, and no motor deficits. (Tr. 289).

2

In August 2008, Plaintiff saw Dr. Grinnen at Metro with complaints of neck pain. (Tr. 263-65). Plaintiff said she had been experiencing neck pain for three weeks but could not recall an exacerbating injury. (Tr. 263). She said the pain shot up the back of her neck and traveled down her arm. (Tr. 263). Her cervical spine and right shoulder were tender but she had intact range of motion in her shoulder joint, cervical spine, elbow, and arm. (Tr. 264). She also had full strength and sensation in her upper extremities. (Tr. 264). Dr. Grinnen diagnosed cervical muscle strain/spasm, prescribed anti-inflammatory medication and physical therapy, and requested an x-ray to address possible nerve impingement. (Tr. 265).

Plaintiff followed up with Dr. Grinnen on October 19, 2008 and complained of neck pain with tingling in her fingers, low back pain, moodiness, weight gain, breast pain, and stomach pain. (Tr. 254). An examination revealed tenderness in Plaintiff's lumbar spine, cervical spine, and left shoulder but intact range of motion, and full strength in her extremities. (Tr. 254-55). Plaintiff could stand on her heels and toes, squat, and straight leg raise testing was negative. (Tr. 255).

A cervical spine MRI taken in October 2008 revealed a disc protrusion and bone spur which caused borderline nerve compression at the C5-C6 vertebral level. (Tr. 341). Dr. Grinnen diagnosed cervical spondylosis, or cervical disc disease, most evident at C5-C6 with cord compression. (Tr. 256, 341). Dr. Grinnen prescribed Celebrex and referred Plaintiff to neurosurgery for an evaluation. (Tr. 257). Plaintiff returned to Dr. Grinnen in November 2008 with continued complaints of neck and shoulder pain but was "[d]oing well" on Celebrex and Amitriptyline, and her mood was better with Zoloft. (Tr. 242-43).

Per Dr. Grinnen's referral, Plaintiff saw Shane Hanzlik, M.D., in Metro's neurosurgery department in November 2008. (Tr. 245-49). Plaintiff had full strength in her upper extremities,

3

normal range of motion in her back, and no costovertebral angle tenderness. (Tr. 247).  She had a normal gait and her reflexes were equal and symmetric. (Tr. 247). Dr. Hanzlik recommended an EMG of her upper extremities, prescribed Vicodin and wrist splints, and referred her to a pain management clinic. (Tr. 248).

On November 24, 2008, Plaintiff presented at Metro and saw Dr. David Ryan. (Tr. 237). She complained of neck pain that radiated down her arm. (Tr. 247). He noted she had been to neurosurgery but "the only finding was some bulging discs and osteophytes on imaging." (Tr. 237). An examination revealed no arthritic pain, a normal gait, no joint swelling, no muscle weakness, and a lack of neurological symptoms, such as seizures, weakness, numbness, burning pain, tremors, or tingling in hands or fingers. (Tr. 238). Cervical range of motion in Plaintiff's back and neck was "mildly painful" on flexion, rotation, and extension. (Tr. 239). She had normal sensation, reflexes, fine coordination, and motor strength in her extremities, except for median nerves in the fingertips of her right hand. (Tr. 239). Dr. Ryan diagnosed Plaintiff with cervical and lumbosacral spondylosis without myelopathy and recommended pool therapy at least three times per week for thirty minutes. (Tr. 240). He prescribed Neurotonin and physical therapy and advised Plaintiff to quit smoking. (Tr. 240).

Carpal Tunnel Syndrome

In November 2008, Dr. Hanzlik found Plaintiff had "probable" bilateral CTS  in her wrists. (Tr. 247). Four months later, in March 2009, Plaintiff sought treatment at Metro for "chronic pain from fingertips to elbows reported as achey [sic] pain." (Tr. 394). An EMG showed "mild findings" in Plaintiff's right wrist and Dr. Coale noted her symptoms correlated with cubital tunnel syndrome in her ring and small digits. (Tr. 395). He "[d]iscussed with [Plaintiff] at length" that her clinical

4

symptoms did not correlate with the EMG findings. (Tr. 395).

In early October 2009, Plaintiff reported she did not like wearing her wrist splints and did not want injections. (Tr. 460). Despite only median compression, she requested surgery. (Tr. 460). Plaintiff underwent carpal tunnel release surgery on her right wrist in October 2009 and by December 2009, she reported "complete resolution of tingling sensation" and was "cleared for full use of [her] [right] hand." (Tr. 460-61, 487, 491-92).

At a follow-up visit in June 2010, Plaintiff reported her right hand had "returned completely to normal." (Tr. 546). However, she complained of increased carpal tunnel symptoms in her left hand. (Tr. 546). Plaintiff underwent carpal tunnel release surgery in her left hand in July 2010, which resolved her symptoms. (Tr. 526-33, 538-41). An x-ray of Plaintiff's left wrist taken July 27, 2010 was normal with no evidence of an acute fracture, dislocation, or other osseous abnormality. (Tr. 553).

Knee Treatment

On February 15, 2009, Plaintiff twisted her left knee and sought treatment in Metro's emergency room. (Tr. 418). X-rays showed mild degenerative changes with some narrowing of the medial compartment and small suprapatellar joint effusion, but no evidence of fracture or dislocation. (Tr. 411, 418). Notes indicated "no sig[nificant] knee pain with passage [range of motion]," no redness or warmth, but moderate effusion and some tenderness to palpation. (Tr. 418). Plaintiff was placed in a knee immobilizer, given crutches, and discharged. (Tr. 416).

In March 2009, Plaintiff complained of knee stiffness but had negative Lachman's and Murray's tests. (Tr. 429). She also had no tenderness to palpation with motion but mild tenderness along the lateral joint line. (Tr. 429). Plaintiff was referred to physical therapy but only attended two

5

sessions before being discharged for failure to attend appointments. (Tr. 466).

Plaintiff presented to Metro with left knee pain after falling down on August 24, 2009. (Tr. 444). An examination of Plaintiff's left knee revealed no abnormality, swelling, or joint deformity but tenderness and pain during movement. (Tr. 446). Plaintiff was diagnosed with left knee pain, advised to use a hot compress, and prescribed medication. (Tr. 446).

An October 2009 MRI of Plaintiff's left knee showed degeneration with effusion. (Tr. 458, 473-74). Plaintiff received a steroid injection and was advised to do home exercises and take anti-inflammatory medication. (Tr. 458). A physical examination in October 2009 revealed a normal gait, normal reflexes, intact sensation, no motor deficits, and no joint deformity, but decreased range of motion in her left knee. (Tr. 464).

Dr. Erick Kauffman

Plaintiff presented to Dr. Kauffman as a new patient on February 8, 2011 and indicated she was applying for SSI. (Tr. 621). She complained of neck and back pain, left knee pain, right foot pain, and pain with walking. (Tr. 621-22). Her initial examination revealed normal range of motion in her neck and musculoskeletal system. (Tr. 622). She had no tenderness but exhibited myalgias, back pain, and joint pain. (Tr. 622). Dr. Kauffman diagnosed degenerative disc disease and prescribed Naproxen. (Tr. 623).

On March 16, 2011, Dr. Kauffman completed a work related activity report on Plaintiff's behalf. (Tr. 584-85). He found Plaintiff could lift and/or carry less than ten pounds occasionally and five pounds frequently. (Tr. 584). She could stand and/or walk for up to two hours cumulatively out of an eight-hour workday, and without interruption for twenty minutes. (Tr. 584). Dr. Kauffman further found Plaintiff could sit for two hours out of an eight-hour workday and occasionally

6

balance, stoop, crawl, crouch, or kneel but never climb. (Tr. 584-85). Plaintiff could handle, feel, see, hear and speak but she was limited in her ability to reach, push, and pull.  (Tr. 585). He also restricted her from exposure to heights, moving machinery, temperature extremes, chemicals, and dust. (Tr. 585)

Plaintiff saw Dr. Kauffman a second time on March 22, 2011 and complained of "[p]ain with walking and stooping." (Tr. 612). Dr. Kauffman noted Plaintiff's physical examination was "generally normal." (Tr. 612). He also noted Plaintiff's "[e]xtremities [were] normal and without edema." (Tr. 613). Dr. Kauffman assessed osteoarthritis, not otherwise specified, and "[p]ain in joint, ankle[,] and foot." (Tr. 613).

State Agency Evaluations

On March 30, 2009, state agency physician Gary Hinzman M.D., assessed Plaintiff's physical residual functional capacity (RFC). (Tr. 373-80). He concluded Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently and sit, stand, or walk for six hours in an eight-hour workday. (Tr. 374). Plaintiff had no postural, visual, communication, or environmental limitations. (Tr. 375).  She was limited to frequent handling and fingering bilaterally but unlimited in her ability to reach in all directions. (Tr. 376). Dr. Hinzman noted his findings were based on examinations revealing Plaintiff's normal gait, normal motor and sensory functioning, activities of daily living, and mild pain and tenderness in her cervical and lumbar spine. (Tr. 378).

On October 20, 2009, state agency physician William Bolz, M.D., found Plaintiff could engage in light work with some postural limitations, including occasional climbing of ramps or stairs and occasional balancing, stooping, kneeling, crouching, and crawling, but no climbing ladders, ropes, or scaffolds. (Tr. 478).

***Mental Impairments***

<u>Dr. Berrones</u>

In April 2009, Plaintiff was referred to Enedina Berrones, M.D., for a mental health assessment. (Tr. 390-93). Plaintiff said she did not know why she was referred other than her primary care physician told her she "looked a little down." (Tr. 390). She reported she was sexually abused when she was ten or eleven. (Tr. 390). Plaintiff also reported doing jail time for selling drugs and making and cashing fake checks. (Tr. 391). She said he had never been diagnosed with a psychiatric disorder nor had she ever seen a psychiatrist. (Tr. 391). Plaintiff was teary and depressed but also calm, cooperative, and well-groomed, and her speech was clear and appropriate with normal rate and flow. (Tr. 392). Plaintiff's thought content was normal with no hallucinations, paranoia, or suicidal ideation. (Tr. 392). She was diagnosed with major depressive disorder (MDD), post-traumatic distress disorder (PTSD), and assigned a global assessment of functioning (GAF) score between 41-50.[1] (Tr. 392). Plaintiff did not return for her scheduled follow-up appointment and did not respond to follow-up letters or phone calls from Dr. Berrones. (Tr. 563-64). She was officially discharged from treatment for poor compliance in April 2010. (Tr. 564).

<u>Murtis Taylor Center</u>

Plaintiff began treatment at the Murtis Taylor Center in November 2010. (Tr. 586-92, 627-29). At her initial assessment with Sandra Lavelle, R.N., Plaintiff was clean and casual with a

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).A GAF score between 41-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

depressed mood, limited insight, no paranoia, no delusions, low risk of self harm, and occasional restricted affect. (Tr. 591). Ms. Lavelle found Plaintiff intelligent but assigned a GAF score of 45 and diagnosed MDD and PTSD.[2] (Tr. 592).

Ellen Alaimo, PMHCNS-BC, completed a mental functional capacity assessment form for the Ohio Welfare Department a week after Plaintiff was initially assessed by Ms. Lavelle. (Tr. 580-81). In the form, Ms. Alaimo found Plaintiff was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out short, simple instructions; perform activities within a schedule; maintain regular attendance and punctuality; make simple, work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work-setting. (Tr. 580). She was markedly limited in her ability to remember and carry out detailed instructions; maintain concentration for an extended period; work with others; complete a normal workday or workweek without interruption; interact with the general public; accept instructions and respond appropriately to criticism from supervisors. (Tr. 580). Overall, Ms. Alaimo found Plaintiff was "unemployable."  (Tr. 580).

Subsequently, Plaintiff attended six therapy sessions with Ms. Alaimo from February 2011 through July 2011. (Tr. 586-92, 627-29). During these sessions, Plaintiff was generally cooperative, neat, and casual with normal speech (Tr. 586, 587, 588, 628, 629), made good eye contact, had no obvious thought disorder (Tr. 588), and had fair insight (Tr. 627). However, Plaintiff was moody and irritable and Ms. Alaimo was working with Plaintiff to alleviate those symptoms by adjusting her medication. (Tr. 586-88, 627-29).

---

2. *See supra* note 1.

Consultive Examiner Mitchell Wax, Ph.D.

Plaintiff saw Dr. Wax for a consultive examination on February 4, 2009. (Tr. 349-54). Plaintiff reported she could not work because of various physical ailments. (Tr. 349-50). She also said she had never received psychiatric care and was not in counseling. (Tr. 349-50). Plaintiff reported she was previously incarcerated on several occasions for possession and distribution of illegal drugs and possession of criminal tools. (Tr. 350). She also said she had been laid off from her last job as a machine operator in 2005, but indicated she had no difficulty performing the job. (Tr. 350). Plaintiff said she was a "neat freak" who cleaned her house over and over. (Tr. 350). She said she vacuumed three times a day and could not have a dirty dish in the sink. (Tr. 350).

Plaintiff had a blunt affect, spoke in a monotone voice, made no eye contact, and showed annoyance. (Tr. 350). She reported conflicting information and Dr. Wax suspected malingering. (Tr. 350). For example, she said she was dependant on friends who came over to help her but later said she had no friends. (Tr. 350). Dr. Wax also suspected malingering based on her tendency to withhold information, including how she obtained money to live and how she spent a typical day. (Tr. 350).

Concerning daily activity, Plaintiff said she woke at 6:00 a.m. and cleaned the house until noon. (Tr. 352). She then showered, dressed, and stayed at home unless she had to pay a bill or shop for groceries. (Tr. 352). She had friends over two or three times per month and read two-to-three books per month. (Tr. 352). She did laundry weekly, cleaned the bathroom daily, and vacuumed three times a day. (Tr. 352). She went on walks two times a month and watched television four-to-five hours per day. (Tr. 352).

Dr. Wax concluded Plaintiff had average intelligence and sufficient judgment to make important decisions and live independently. (Tr. 351-52).  He found she was mentally capable of

10

understanding, remembering, and following instructions but assessed her ability to relate to others and maintain attention, concentration, and persistence as moderately impaired. (Tr. 353). Her pace was normal but she was not persistent. (Tr. 353). Plaintiff could perform simple, repetitive tasks, but would have difficulty operating a full-time job due to depression and personality disorder. (Tr. 353). He diagnosed MDD, panic disorder with agoraphobia, and personality disorder with borderline and obsessive features. (Tr. 353). Dr. Wax assigned a GAF of 51.[3]

<u>State Agency Evaluations</u>

On March 9, 2009, state agency psychiatrist David Demuth, M.D., assessed Plaintiff's mental RFC. (Tr. 369-71). He found no evidence of limitation or no significant limitation in the majority of mental limitation categories. For example, he found she was not significantly limited in her ability to understand and remember detailed instructions and work-like procedures, perform activities within a schedule, maintain regular attendance, or sustain an ordinary routine without supervision. (Tr. 369). Plaintiff was also not limited in her ability to make simple, work-related decisions, set realistic goals, or use public transportation. (Tr. 370). However, he found Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain concentration for extended periods, work with others without being easily distracted, interact appropriately with others, and complete a normal workday or workweek without interruptions from psychologically based symptoms. (Tr. 369-70). She was also moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 370).

Dr. Demuth specifically found Plaintiff was capable of performing simple, repetitive tasks

---

3. A GAF score of 51 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks ) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR*, at 34.

in a work environment with few changes, no strict production quotas, and limited contact with others. (Tr. 371). Psychologist Joan Williams, Ph.D., affirmed Dr. Demuth's analysis on July 7, 2009. (Tr. 442).

VE Testimony & ALJ Decision

At the hearing, the ALJ asked the VE to consider a hypothetical person of the same age, education, and work experience as Plaintiff who was limited to a full range of light work exertionally. (Tr. 69).  This individual could never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs, occasionally stoop, kneel, crouch, crawl, or balance, and frequently engage in gross and fine finger manipulation of objects with the left upper extremity. (Tr. 69). This individual must avoid concentrated exposure to hazardous machinery and unprotected heights and was limited to work involving simple, routine, and repetitive tasks in a low stress environment with only occasional changes in the work setting and only occasional interaction with the general public and co-workers. (Tr. 69-70). The VE testified that such a person could perform work as a bench assembler, wire worker, and final assembler according to the Dictionary of Occupational Titles (*DOT*). (Tr. 70-71).

The ALJ then asked the VE to consider a hypothetical individual with the same restrictions as above but who could perform a full range of exertional sedentary work. (Tr. 72). The VE found such a person could perform jobs in the national and local economies according to the *DOT*. (Tr. 72).

Finally, the ALJ proposed a hypothetical person with the same restrictions who could perform a full range of sedentary work exertionally but could only occasionally engage in gross and fine finger manipulation of objects with the left upper extremity. (Tr. 73). The VE testified this

12

individual could perform work according to the *DOT* but only if one hand took on extra duties. (Tr. 74).

On May 18, 2011, the ALJ found Plaintiff had the severe impairments of CTS, degenerative joint disease of the knees, degenerative disc disease, obesity, MDD, personality disorder, and panic disorder. (Tr. 16). Nevertheless, the ALJ found Plaintiff was not disabled.

Specifically, the ALJ found Plaintiff had the RFC to perform light work except she could never climb ladders, ropes, or scaffolds, could only occasionally climb ramps or stairs, occasionally stoop, kneel, crouch, crawl, or balance, and could engage in frequent bilateral gross and fine finger manipulation. (Tr. 18). The ALJ also restricted Plaintiff from concentrated exposure to the use of hazardous machinery, moving machinery, and unprotected heights. (Tr. 18). Plaintiff could perform simple, routine, and repetitive tasks in a low stress work environment with only occasional change and occasional interaction with coworkers or the public. (Tr. 18-19).

The ALJ considered Dr. Kauffman's opinion but gave it little weight for several reasons. (Tr. 21). The ALJ noted their brief treatment relationship, a lack of objective testing, inconsistent opinions from state agency physicians, and a lack of support from the record. (Tr. 21). The ALJ also discussed Ms. Alaimo's opinion and gave it little weight because it was contrary to other opinions in the record, including three medical doctors who independently evaluated Plaintiff; Ms. Alaimo had a  brief treatment relationship with Plaintiff; Plaintiff had a limited mental health treatment record; and Plaintiff's activities of daily living were inconsistent with her assessment. (Tr. 22-23).

Based on VE testimony, the ALJ concluded Plaintiff could perform work in the local and national economies and therefore, she was not disabled. (Tr. 24-25).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

    1.      Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ failed to articulate "specific and legitimate reasons" for discrediting Dr. Kauffman and Ms. Alaimo's opinions. (Doc. 18, at 3). Plaintiff also argues the ALJ erred in his analysis at step five of the sequential evaluation. (Doc. 15, at 12-15).

## ALJ's Treatment of Opinion Evidence

Medical opinions are defined as "statements from physicians . . . that reflect judgements about the nature and severity of [a claimant's] impairments, including . . . symptoms, diagnosis, and prognosis, what [a claimant] can still do despite the impairments(s), and [a claimant's] physical or

15

mental restrictions."  20 C.F.R. § 416.927(a).

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009),

16

but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

### Dr. Kauffman

At the outset, Defendant argues Dr. Kauffman is not a treating source under applicable law. (Doc. 17, at 17, n. 7). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

Plaintiff presented to Dr. Kauffman with back pain and specifically indicated she was applying for SSI. (Tr. 621). Physicians who are utilized solely to provide reports for a claim of disability are not considered treating sources. 20 C.F.R. § 416.902 ("We will not consider an acceptable medical course to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.").

Further, Plaintiff saw Dr. Kauffman twice, and only once before he filled out the functional capacity opinion in question. (*See* Tr. 584-85, 612-13, 621-22). Generally, one visit with a physician is not enough to establish and ongoing treatment relationship. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006) (noting "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship," and "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005) (finding that a physician who saw claimant two times for his back pain did not qualify

17

as a treating source).

Based on these facts, Dr. Kauffman does not qualify as a treating source. Regardless, the ALJ provided several good reasons, supported by substantial evidence, which comply with the treating physician rule. The ALJ gave Dr. Kauffman's opinion "little weight" based on a brief treatment relationship, lack of objective testing, inconsistency with state agency physician opinions, and lack of record support. (Tr. 21). These reasons touched upon several of the regulatory factors an ALJ is required to consider when deciding how much weight to afford to a particular opinion; namely, treatment relationship length, including frequency, nature and extent; supportability; and consistency of the opinion with the record as a whole. § 416.927;  *Ealy*, 594 F.3d at 514.

Plaintiff argues, however, that these reasons were not "specific and legitimate"; specifically, because the ALJ discredited Dr. Kauffman's opinion based on length of treatment and "then [] accept[ed] the opinions of [state agency] doctors who never [examined her]." (Doc. 18, at 3). However, it is the ALJ, not a claimant's treating physician, who is responsible for determining whether a claimant is disabled. § 416.927(d)(1); SSR 96-5p, 1996 WL 374183, *2. In doing so, the ALJ must evaluate all of the evidence provided. §§ 416.920b, 416.927.

The Commissioner views state agency physicians "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011); § 416.927(d),(f); SSR 96-6p, at *2-3. The ALJ specifically noted that Dr. Kauffman would normally be entitled to more weight than a state agency physician, but a lack of objective testing, record support, and limited treatment relationship weighed against doing so. (Tr. 21).

Plaintiff points to a diagnosis of "cervical disc disease with cord compression" as support

18

for Dr. Kauffman's limiting assessment. (Doc. 15, at 10; Tr. 256). However, Plaintiff fails to point to any objective test from the record showing this diagnosis correlates with Dr. Kauffman's limited functioning assessment. To the contrary, Plaintiff generally had normal range of motion in her spine and neck, normal reflexes, intact muscle sensation, normal gait, and negative straight leg raise testing. (Tr. 239, 247, 255, 289,464). Further, after Plaintiff injured her knee in 2009, an examination revealed no significant pain with passive range of motion, no redness or warmth, and moderate swelling. (Tr. 411, 418). Moreover, x-rays showed only mild degenerative changes. (Tr. 411, 418).  Plaintiff also had intact range of motion her arms and elbows (Tr. 255) and full strength in her extremities (Tr. 255). Indeed, CTS had resolved in her right hand as of December 2009 and in her left hand by July 2010. (Tr. 487, 491, 493-95, 526-33, 538-41).

Significantly, even Dr. Kauffman's own treatment notes contradict his assessment.  At her initial appointment, Dr. Kauffman found Plaintiff had normal range of motion in her neck and back with no swelling or tenderness. (Tr. 622-23). At her second examination, made after the work activity report, Dr. Kauffman found was Plaintiff was "generally normal" and diagnosed osterarthritis and foot pain. (Tr. 613).

Last, Plaintiff's reported activities of daily living contradict Dr. Kauffman's assessment. For instance, Plaintiff reported she was a "neat freak" and cleaned her house from six in the morning until noon. (Tr. 352). Afterwards, she showered, dressed, and stayed home unless she had to grocery shop. (Tr. 352). She did laundry weekly, cleaned the bathroom daily, and vacuumed three times a day. (Tr. 352). Plaintiff also rolled silverware five hours a day for five days in row in order to get her license reinstated. (Tr. 42, 50). Accordingly, the ALJ provided "specific and legitimate" reasons for discounting Dr. Kauffman's opinion and substantial evidence supports his decision.

19

### Ms. Alaimo

Ms. Alaimo is not an "acceptable medical source" that can establish whether a social security claimant has a "medically determinable impairment." § 416.913(a); *see Southward v. Comm'r of Soc. Sec.*, 2012 WL 3887212, *2 (E.D. Mich 2012). Rather, she is an "other source[]" who may be used as evidence "to show the severity of [Plaintiff's] impairment(s) and how it affects [her] ability to work." § 416.913(d)(1).

While the regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources", they do not explicitly address how to consider opinions and evidence from "other sources" listed in § 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." 2006 WL 2329939, at *3. SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p.

Here, the ALJ gave Ms. Alaimo's opinion little weight based on inconsistency with the consultive examiner and state agency opinions, limited treatment relationship, limited mental health treatment record, lack of support, and activities of daily living. (Tr. 23). The ALJ not only assigned weight, he provided reasons touching upon several of the factors an ALJ may consider when evaluating "other sources" – treatment relationship and length, supportability, and consistency.

Substantively, Plaintiff argues the ALJ's reasons for discounting Ms. Alaimo's were flawed. Specifically, because the ALJ discredited Nurse Alaimo's opinion based on length of treatment but

went on to accept the opinions of two state agency reviewers and a consultive examiner. (Doc. 18, at 13). Simply stated, this argument lacks merit.

First, the record is not clear Ms. Alaimo even met with Plaintiff before providing her assessment.[4] Moreover, as noted above, the ALJ, not a claimant's treating physician, is responsible for determining whether a claimant is disabled, and the ALJ may rely on state agency physician and consultive examiner opinions. §§ 416.927(d),(f); SSR 96-6p, at *2-3. Regardless, the ALJ provided a plethora of reasons beyond inconsistencies with state agency reviewers and consultants sufficient to discount Nurse Alaimo's opinion – namely, length of treatment relationship, supportability, limited mental health treatment, and activities of daily living. (Tr. 23).

Plaintiff also argues the ALJ erred because each physician who saw her found "significant mental limitations." (Doc. 15, at 11). As support, she points to Dr. Berrones' GAF score indicating serious symptoms. (Doc. 15, at 11). However, the medical opinions in the record support the ALJ's RFC finding, not Ms. Alaimo's assessment.

Plaintiff's lack of mental health treatment was highlighted by Dr. Berrones in April 2009, who noted she had never received mental health treatment despite sexual abuse as a child.[5] (Tr. 390-91). Plaintiff did not return for her follow-up appointment with Dr. Berrones and was discharged from treatment for failing to show up to her appointments. (Tr. 390-91, 564). Plaintiff did not seek treatment again until November 2010, when she was initially assessed by Nurse Lavelle at the

---

4. Plaintiff met with Nurse Lavelle at Murtis Taylor Center in November 2010. (Tr. 586-92). That same month, Ms. Alaimo provided a mental functional capacity assessment for the Ohio Welfare Department. (Tr. 580-81). However, nothing in the record suggests Plaintiff saw or began treatment with Ms. Alaimo until February 2011. (Tr. 586-92, 627-29).

5. Plaintiff implies the ALJ erred by relying on Dr. Wax's opinion because she could not open up about abuse to a man; however, despite reporting said abuse to Dr. Berrones, a woman, Plaintiff was calm, cooperative, had normal thought content, did not know why she was referred for mental health treatment, and never returned for rescheduled appointments. (Tr. 390-91).

Murtis Taylor Center. (Tr. 589-92).

In addition to minimal treatment, Dr. Wax found Plaintiff had average intelligence, appropriate thought content, no autonomic signs of anxiety, no mental confusion, and no paranoia. (Tr. 350-52). Plaintiff also cleaned her house regularly, socialized, attended church, and regularly spoke with her sister and a friend (Tr. 350-52). In addition, Plaintiff was able to maintain concentration to roll silverware for five hours a day. (Tr.52, 60). Furthermore, Ms. Alaimo's treatment notes showed Plaintiff was moody and irritable at times, but generally she was cooperative, neat, and casual with normal speech, made good eye contact, and had fair insight. (Tr. 586-88, 627-29).

Moreover, in line with the ALJ's finding, Dr. Demuth found Plaintiff could perform simple, repetitive work tasks so long as there were no strict production quotas and limited contact with others. (Tr. 369-71). Similarly, Dr. Wax found Plaintiff could perform simple, repetitive tasks despite her mental impairments. Accordingly, the ALJ complied with SSR 06-3p when evaluating Ms. Alaimo's opinion and his decision was supported by substantial evidence.

**ALJ's Step Five Finding**

Plaintiff argues the ALJ crafted an RFC that failed to duplicate any of his hypothetical questions. (Doc. 15, at 14). Specifically, she asserts the ALJ "talked about low stress [in his RFC], but the questions to VE only talked about an absence of fast paced order requirements." (Doc. 15, at 14). This assertion is simply not accurate. The ALJ's initial hypothetical described, in pertinent part, an individual who was limited "to work involving simple routine and repetitive tasks in a low stress environment with only occasional changes in the work setting" and occasional interaction with coworkers. (Tr. 69-70). The ALJ ultimately included this portion of the hypothetical in his RFC. (Tr. 18-19).

Next, Plaintiff argues she cannot engage in frequent gross and fine manipulation, but points to no evidence as support. (Doc. 15, at 14). To the contrary, the medical evidence shows CTS in both Plaintiff's hands had resolved, and her right hand was fully functional. (Tr. 546, 526-33, 538-41). Accordingly, the ALJ did not err at step five.

CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II<br>United States Magistrate Judge